IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

CAP SERVICES, INC., and
COMMUNITY ASSETS FOR PEOPLE, LLC,

                              Plaintiffs,                    OPINION AND ORDER

        V.
                                                            16-cv-671-wmc
DALE R. SCHWARTZ,

                              Defendant.

In this lawsuit, plaintiffs CAP Services, Inc., and Community Assets for People, LLC, allege that Defendant Dale R. Schwartz ("Schwartz") has breached his personal guaranty of two loans, totaling more than $1.4 million dollars, plus interest and late fees. Before the court are the parties' cross-motions for summary judgment. (Dkt. #13, 17.) Because the disputed guarantees were valid on their face and defendant's affirmative defenses, including those that form the basis for his own summary judgment motion, fail as a matter of law or were waived, the court will grant plaintiffs' motion for summary judgment.

UNDISPUTED FACTS[1]

**A. The Parties**

Plaintiff CAP is a not-for-profit Wisconsin corporation under section 501(c)(3) of the Internal Revenue Code and plaintiff Community Assets is its wholly owned, limited liability corporation. Each maintains their principal place of business in Stevens Point,

_____
[1] Based on the parties' proposed findings of fact, the court finds the following facts to be material and undisputed when viewed in a light most favorable to the defendant.

Wisconsin, and lends money to organizations, companies, and ventures to advance community-based interests.

Defendant Schwartz is domiciled in Faribault, Minnesota, the sole owner of Faribo Plumbing & Heating, Inc., a plumbing and heating services contractor with its principal place of business in Faribault. In addition to its plumbing services, Faribo performs excavation work and installs heat and sewer pipes. Since approximately 1984, Schwartz has been the sole owner of Faribo.[2]

### B. GreenWhey

GreenWhey Energy, Inc., currently operates an anaerobic digester facility in Turtle Lake, Wisconsin, which processes and converts liquid waste into sustainable energy for its customers, primarily food and dairy producers. At all relevant times, GreenWhey was owned and managed by Larry Peaster, Timothy Peaster, and its president Tom Ludy. Ultimate control of GreenWhey is exercised by its parent company, GreenWhey Holdings, Inc.

Back in 2010, GreenWhey retained a well-known accounting and advisory firm, Baker Tilly, to evaluate the feasibility of constructing and operating the Turtle Lake Facility, determine its eligibility for a federal New Markets Tax Credit (NMTC) and help procure loans and investments from third parties to fund the construction. A firm director, Michael Land, led the Baker Tilly team and was GreenWhey's primary contact. While GreenWhey procured loans and investments, Land communicated frequently with Ludy.

[2] Accordingly, this court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) as there is complete diversity between the parties and the amount in controversy easily exceeds $75,000.

In June 2012, Ludy and Land discussed the possibility of GreenWhey obtaining a secondary loan from CAP Services' NMTC program. GreenWhey and CAP, including its subsidiary Community Assets, then began negotiating the possibility that plaintiffs would provide financing for the development of the Turtle Lake Facility. At no point did plaintiffs or defendant participate in GreenWhey's operations or management, own any portion of GreenWhey or possess the authority to make decisions on GreenWhey's behalf.

Defendant's company, Faribo Plumbing & Heating, was originally hired as a subcontractor to install piping for water, drainage and processing at GreenWhey's Turtle Lake Facility. Faribo also installed radiators and drains on that facility's roof, along with bypass valves, a heat exchanger and other piping. While performing this work, defendant Dale Schwartz personally visited the Turtle Lake site approximately 20 times. After completing its work, Faribo was paid all but approximately $30,000 of its contract. Faribo also loaned GreenWhey $100,000 in return for a promissory note for the same amount, dated October 5, 2011, which included a promise to pay 10% annual interest on the principal.

GreenWhey also utilized this relationship with Faribo to approach Schwartz about the possibility of his serving as a guarantor on a loan. Consequently, when Baker Tilly director Land explained to GreenWhey president Ludy that CAP would require a personal guaranty from a third party before it would make a loan, Ludy informed Land that he had already spoken with defendant Schwartz about that possibility.

During this period, Schwartz knew that Land was working to help GreenWhey raise funds. Additionally, on June 7, 2012, Land emailed Schwartz a document stating that his

employer Baker Tilly had been retained by GreenWhey. (Pls.' Proposed Findings of Fact (dkt. #22) ¶ 106.) In a June 18, 2012, email to Schwartz, Land further stated that "Tom Ludy asked me to email you regarding a funding opportunity we are pursuing for [GreenWhey]." (Pls.' Proposed Findings of Fact (dkt. #22) ¶ 112.)[3] Land also told Schwartz in the same email that: (1) GreenWhey intended to ask CAP for a loan to pay for "heat sale related infrastructure costs"; and (2) CAP "will require a guarantee from a company or individual with sufficient net worth to back up repayment of the loan." (Id. at ¶¶ 113-114.) After Land sent his June 18 email, Ludy also explained that if Schwartz was interested in serving as a guarantor, he would need to prepare a personal financial statement so CAP could confirm that he possessed sufficient assets to cover the loans.

Baker Tilly and Land did not represent plaintiffs in their transactions with GreenWhey nor in the negotiation and execution of plaintiffs' eventual agreements with defendant Schwartz (the "Guaranty Agreements"). Plaintiffs were not even the only potential funding source that Land approached on GreenWhey's behalf. In his June 18 email to Schwartz, however, Land did state that plaintiff CAP is a "client" of Baker Tilly. This was based on Land's understanding that Baker Tilly had previously interacted with CAP regarding federal NMTC matters. (Pls.' Proposed Findings of Fact (dkt. #22) ¶ 118.)[4]

Schwartz never spoke, emailed or otherwise communicated with anyone working for CAP or its subsidiary Community Assets. Nor did CAP or Community Assets ever

---

[3] This June 18 email to Schwartz again disclosed Baker Tilly's role on behalf of GreenWhey. (*Id.* at ¶ 107.)

[4] Plaintiffs had in fact retained Baker Tilly in the past to provide general NMTC compliance counseling and training.

attempt to communicate directly with Schwartz. All communications between the two parties to this lawsuit were directed through Ludy and Land. Nonetheless, Schwartz contends that he came to believe that Ludy, Land, Baker Tilly and GreenWhey were all acting as "agents" of the plaintiffs during this timeframe.

## C. Defendant Guarantees Repayment of Plaintiffs' Loans to GreenWhey

On June 20, 2012, Land emailed Mary Patoka, the president and CEO of both plaintiffs, to advise that additional financing was needed to pay for piping infrastructure at GreenWhey's facility. Land also informed her that defendant Schwartz "has indicated a willingness to provide credit support for this funding," and he would be providing a personal financial statement for plaintiffs' evaluation. (Pls.' Proposed Findings of Fact (dkt. #22) ¶ 137.)

That same day, Patoka participated in a call with Land and Ludy, who confirmed that Schwartz would likely serve as GreenWhey's guarantor if plaintiffs considered him acceptable. Defendant Schwartz sent his personal financial statement to Land the next day, although Schwartz has since stated it was inaccurate. Land forwarded that statement to Patoka the following day, confirming that Schwartz was "the contemplated guarantor" in his cover email. Schwartz was copied on that email.

After reviewing Schwartz's financial statement and conducting a diligence review of GreenWhey, plaintiffs decided to lend the money to GreenWhey. Plaintiffs' attorneys then drafted and sent documents, including the two Guaranty Agreements, to GreenWhey's lawyers. In doing so, plaintiffs also informed Ludy and Land that they were not willing to fund the loans until they had received Schwartz's signatures on the Guaranty

Agreements.

On or about September 7, 2012, GreenWhey executed and delivered to plaintiff CAP a Fixed Rate Note in the original principal amount of $1,000,000.00 (the "CAP Note") and a New Markets Tax Credit Agreement (the "CAP NMTC Agreement"). (Pls.' Proposed Findings of Fact (dkt. #22) ¶ 27.) On or about that same date, GreenWhey executed and delivered to plaintiff Community Assets a Fixed Rate Note in the original principal amount of $420,881.36 ("the Community Assets Note") and a New Markets Tax Credit Agreement (the "Community Assets NMTC Agreement"). (*Id*. at ¶ 29.) Consistent with the terms of these two NMTC Agreements, GreenWhey was obligated to repay all amounts due under the CAP Note and the Community Assets Note.

Land also forwarded Schwartz the final versions of the Guaranty Agreements, dated September 7, 2012, which would render Schwartz personally liable for payment of the full amount then due and owing by GreenWhey should it default under the CAP Note, the Community Assets Note and the related NMTC Agreements. (Pls.' Proposed Findings of Fact (dkt. #22) ¶ 47.)[5] Although Schwartz did not sign the Guaranty Agreements at first -- because they did not include incentives he had demanded in return for guaranteeing the loans (such as a seat on the board of directors of Holdings) -- Schwartz does not dispute eventually signing both guarantees once certain demands were met. In fact, on September 13, 2012, Ludy emailed Schwartz an additional agreement (the "Letter Agreement") signed by Ludy as president of Holdings, GreenWhey's parent company. (Pls.' Proposed Findings

---

[5] Land then resent the final versions of the Guaranty Agreements to Schwartz on September 10, 2012. (Pls.' Proposed Findings of Fact (dkt. #22) ¶ 48.)

of Fact (dkt. #22) ¶ 154.)  The Letter Agreement provided that, "[t]o induce [Schwartz] to provide the [loan guarantees]," Holdings agreed to pay Schwartz 10% of all income it received from GreenWhey, excluding certain amounts to be paid to third parties.  (*Id*. at ¶ 155.)  Holdings also committed to give Schwartz access to the books and records of the GreenWhey entities, including board meeting minutes.  (*Id*. at ¶ 156.)  Schwartz then signed the Letter Agreement and returned it to Ludy on September 15, 2012.  Less than a minute later, Schwartz also sent Ludy the executed signature pages for both Guaranty Agreements.  (Pls.' Proposed Findings of Fact (dkt. #22) ¶ 160.)

Moreover, just as contemplated by the parties at closing on the loans on September 7, plaintiffs did not release the proceeds to GreenWhey until September 18, 2012, *after* their lawyers had received Schwartz's executed signature pages for the Guaranty Agreements.   Once received, plaintiff CAP transferred $1,000,000.00 and plaintiff Community Assets transferred $420,881.36 to GreenWhey.

Under the express terms of the Guaranty Agreements, defendant Schwartz "absolutely and unconditionally" guaranteed payment of all indebtedness of GreenWhey under the loan documents.  (Pls.' Proposed Findings of Fact (dkt. #22) ¶ 35.)  In addition, the agreements state that:  (1) they are guarantees of payment rather than collection; (2) notice of both acceptance of the Guaranty Agreements and nonpayment of the loan documents were waived; and (3) Schwartz agreed to pay all costs, expenses and reasonable attorneys' fees incurred by plaintiffs to collect on the Guaranty Agreements.

### D. GreenWhey Default

GreenWhey made one lump sum, interest-only payment to CAP of $20,000.26 at

the closing of the CAP Loan and a lump sum, interest-only payment to Community Assets of $8,417.74 at the closing of the Community Assets Loan. Because of construction delays, plaintiffs agreed that GreenWhey would begin repaying the Notes after construction had finished. GreenWhey began making interest-only payments on both loans in June 2014, after construction was complete, but never repaid any of the principal on either loan and defaulted outright under its agreements with plaintiffs in May of 2015.

Plaintiffs nevertheless determined their best interests were served by working to negotiate a resolution with GreenWhey in 2015 and 2016. In particular, plaintiffs' junior status in a series of inter-creditor agreements and GreenWhey's illiquid assets led plaintiffs to believe that they had a better chance of recovering their loans by working to improve GreenWhey's viability, rather than force GreenWhey's and its other creditors hands by pursuing default and collection. Despite these efforts, GreenWhey ended up in receivership under Wisconsin Chapter 128 in June 2016, and it has since been managed by a court-appointed receiver.

On September 8, 2016, CAP sent a letter to defendant Schwartz notifying him of GreenWhey's default under the CAP loan documents and demanding immediate payment of all amounts due under their loan documents. (Pls.' Proposed Findings of Fact (dkt. #22) ¶ 88.) On the same date, Community Assets did the same. (*Id*. at ¶ 89.) Schwartz received and read both demand letters.

In response, Schwartz claimed that his willingness to guarantee the loans was conditioned on his receipt of preferred stock in Holdings, election to Holdings' board of directors, payment of all amounts GreenWhey then owed to him, documentation that

Ludy was co-signing the loans in his individual capacity, documentation guaranteeing a 10% rate of return to Schwartz for the terms of the Guaranty Agreements, and documentation evidencing that Schwartz would share in certain cash proceeds generated by GreenWhey. While none of these terms were included in Schwartz's Letter Agreement with Holdings or in his Guaranty Agreements with plaintiffs, some had been discussed in an email communication between Schwartz and Ludy in August 2012 *before* the creation of those agreements. Schwartz also claims that Ludy promised to hold Schwartz's signature pages on the Guaranty Agreements in trust until these conditions had been satisfied, but such a promise was never memorialized in any writing. For his part, Baker Tilly's director Land reports having no knowledge of any such promise, including that neither Schwartz nor Ludy ever told him one existed.

To date, no one has paid the amounts due plaintiffs under the CAP and Community Assets Notes. As of August 18, 2017, $1,170,827.40 in principal, interest and late fees remained due and owing on the CAP Note, with interest accruing at the rate of $164.38 per day; and $513,820.13 in principal, interest, and late fees remained due and owing on the Community Assets Note, with interest accruing at the rate of $69.19 per day. Plaintiffs have also incurred $138,270.13 in attorneys' fees and other costs from their efforts to collect on the notes as of August 18, 2017.

OPINION

Plaintiffs and defendant have cross-moved for summary judgment on CAP's and Community Assets' claims for enforcement of their respective Guaranty Agreements with Schwartz. Plaintiffs also request an award of sums due and owing under the CAP and

Community Assets loan documents and an award of plaintiffs' collection expenses, including attorneys' fees, as well as any further award of costs and fees allowed by law.

A court should grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Since plaintiffs seek summary judgment on claims for which *they* bear the burden of proof, plaintiffs "must lay out the elements of the claim, cite the facts which [they] believe satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim." *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015); *see also Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.*, 971 F.2d 37, 42 (7th Cir. 1992). "If the movant has failed to make this initial showing, the court is obligated to deny the motion." *Hotel 71 Mezz Lender LLC*, 778 F.3d at 601; *see also Johnson v. Hix Wrecker Serv., Inc.*, 651 F.3d 658, 662 (7th Cir. 2011) ("A party opposing summary judgment does not have to rebut factual propositions on which the movant bears the burden of proof and that the movant has not properly supported in the first instance.").

"The elements for a breach of contract in Wisconsin are familiar; the plaintiff must show [1] a valid contract that [2] the defendant breached and [3] damages flowing from that breach." *Matthews v. Wis. Energy Corp.*, 534 F.3d 547, 553 (7th Cir. 2008) (citing *Nw. Motor Car, Inc. v. Pope*, 51 Wis. 2d 292, 296, 187 N.W.2d 200 (1971)). Because a personal guaranty is a contract, "the defenses available to a guarantor are grounded in the specific terms and conditions of the guaranty contract." *Park Bank v. Westburg*, 2013 WI 57, ¶ 62, 348 Wis. 2d 409, 434, 832 N.W.2d 539, 552. With the exception of Schwartz's

affirmative defenses, there is little to resolve here: (1) defendant does not and cannot otherwise dispute the existence of a valid, enforceable guarantee of payment on the amounts due on the plaintiffs' notes; (2) defendant does not and cannot dispute that he has failed to honor those commitments; and (3) defendant does not and cannot dispute the amounts due and owing on the notes. Indeed, as set forth in the undisputed facts above, the parties do not dispute that: (1) GreenWhey defaulted on its payment obligations under the loan documents; (2) the Guaranty Agreements require Schwartz to pay all outstanding amounts on demand after a default (plus costs and attorneys' fees incurred in collection); (3) plaintiffs have demanded such payment; and (4) Schwartz has made no payment. If owed, it is also undisputed that plaintiffs correctly calculated their contractual damages as $1,822,917.66 as of August 18, 2017, plus interest running in the amount of $233.57 daily.

Following a properly-supported motion for summary judgment, the burden falls on the non-moving party to establish genuine disputes of material fact sufficient to defeat the motion and justify proceeding to trial. *Id*. "The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment." *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008). Further, the evidence must be such that a jury could reasonably find in the non-moving party's favor. *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010). Nor can mere assertions unsupported by admissible evidence preclude summary judgment. "A party may not merely assert that a fact is or is not genuinely disputed. Rather, the party must cite specific

materials in the record, show that the materials cited by the opponent fail to establish the presence or absence of a genuine dispute . . . or submit an affidavit or declaration by a competent witness based on personal knowledge." 11 James. Wm. Moore, *Moore's Federal Practice* § 56.22[1] (3d ed. 2017).

While Schwartz alleges a total of twenty affirmative defenses in his amended answer to the complaint, defendant advances only three in briefing on the parties' cross-motions for summary judgment: the Guaranty Agreements are (1) void for failure of consideration, (2) void for failure of a necessary condition precedent, or alternatively, (3) barred by the doctrine of equitable estoppel. The other defenses are, therefore, waived. *See United Cent. Bank v. Wells St. Apartments, LLC*, 957 F. Supp. 2d 978, 987–88 (E.D. Wis. 2013), *aff'd sub nom. United Cent. Bank v. KMWC 845, LLC*, 800 F.3d 307 (7th Cir. 2015) ("[W]hen the plaintiff moves for summary judgment on an entire claim, it is necessarily also moving for summary judgment on any affirmative defenses to that claim. It is therefore incumbent on a defendant that wishes to prevent entry of summary judgment on the claim to come forward with evidence showing the existence of a genuine factual dispute concerning an affirmative defense that, if ultimately successful, would defeat the claim. If the defendant does not come forward with such evidence, and the plaintiff otherwise shows that it is entitled to judgment as a matter of law on its claim, then the affirmative defense is extinguished."); *see also Design Basics, LLC v. Best Built, Inc.*, 223 F. Supp. 3d 825, 837 (E.D. Wis. 2016) (citing *Goodman v. National Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010)) ("Defendants have the burden of proof on their affirmative defenses, and summary judgment is the time for the party with the burden of proof to show it has

some evidence such that a jury could find in its favor."). Accordingly, the parties' cross-motions turn on those three affirmative defenses. The court will, therefore, address each in turn.

## I. Failure of Consideration

A guaranty agreement is a contract that must be supported by consideration. *In re Menzner's Estate*, 189 Wis. 340, 207 N.W. 703 (1926). Here, defendant Schwartz argues that the Guaranty Agreements lack consideration and, alternatively, any arguable consideration was provided to GreenWhey rather than to Schwartz. Defendant further contends that this failure of consideration is fatal to enforcement of the guarantees because Schwartz does not possess an ownership stake or any other interest in GreenWhey.

At the outset, defendant concedes that consideration was provided to *GreenWhey*, who received $1,420,881.36 in loan proceeds. Moreover, there can be no dispute that, along with the Notes provided to CAP and Community Assets, the Guaranty Agreements were expressly provided "to induce" plaintiffs to provide those loans to GreenWhey. Consequently, GreenWhey received the benefit of the loan proceeds while plaintiffs incurred the detriment of dispersing the loan proceeds.

In contrast, defendant Schwartz now argues that he received *no* consideration for his agreement to guarantee those loans. However, the record evidence is to the contrary. First, the Letter Agreement signed by Holdings days before the Guaranty Agreements provides direct consideration to the guarantor here, having conferred on Schwartz the right to receive a portion of the income from Holdings' ownership of GreenWhey. In addition, Schwartz also received the right to review the books, records, minutes of board meetings

and other information on the financial condition of Holdings and GreenWhey.[6]  Indeed, Schwartz immediately signed and returned the Guaranty Agreements only moments after countersigning and returning the Letter Agreement conferring those rights.  The fact that these rights ultimately proved valueless is irrelevant to the issue of consideration at the time of contracting.

Second, Schwartz's wholly owned company, Faribo, received payment for work at GreenWhey's facility out of the proceeds of plaintiffs' loans, providing further consideration for Schwartz to enter the Guaranty Agreements.  While Schwartz argues that consideration for Faribo's work was accounted for by the payments themselves, this obscures Schwartz's economic incentives to see the loans go through and for Faribo to be paid.  Moreover, Wisconsin law recognizes the extension of credit to a third party as consideration in situations involving a guaranty agreement.  *See BMO Harris Bank N.A. v. Malaszuk Specialized Logistics, LLC*, No. 15-CV-191-BBC, 2016 WL 1589869, at *3 (W.D. Wis. Apr. 20, 2016) ("[When] the lender is extending a loan in exchange for the guaranty. It does not matter [to the question of consideration] that the loan goes to someone other than the guarantor.") (citing *Electric Storage Battery Co. v. Black*, 27 Wis. 2d 366, 369, 134 N.W.2d 481, 483 (1965) (if plaintiff "agreed to sell the goods to [a third party] upon credit, on condition that the defendant would guaranty the debt," that is adequate consideration to hold guarantor liable)).

Third and finally, Schwartz objects that the Guaranty Agreements were made to

---

[6] While Schwartz contends that additional consideration had been promised to induce his agreement, that issue is addressed under his failure of condition precedent defense.

support existing debt rather than new debt, because they were signed several days after plaintiffs executed the Notes and NMTC Agreements, but this timing is not determinative. Under Wisconsin law, "a guaranty and loan documents executed at the same time between the same contracting parties in the course of a transaction should be construed together." *Assocs. Fin. Servs. Co. v. Eisenberg*, 51 Wis. 2d 85, 89, 186 N.W.2d 272, 274 (1971). While defendant observes that the documents were not signed at the same time, "[t]he critical question is not so much when the documents were signed but whether there was a bargain between plaintiff and defendant and, if so, what was the nature of the bargain." *Amato v. Creative Confections Concepts, Inc.*, 97 F. Supp. 2d 949, 953 (E.D. Wis. 2000) (applying Wisconsin law). Each of the guarantees here were parts of a larger transaction: a loan from two related entities to GreenWhey that was secured by Schwartz's guaranty of payment. Regardless, it is undisputed that the loan proceeds here were not released, and no debt was created, until after receipt of the executed Guaranty Agreements. *See Credit Alliance Corp. v. Campbell*, 845 F.2d 725, 730 (7th Cir. 1988) (applying Indiana law that "[w]here a guaranty is executed subsequently to the principal contract, in order for the guaranty to be regarded as being made at the same time so as to constitute a part of the same transaction and be supported by the same consideration it [may] generally be shown that . . . [t]he guaranty was delivered before any obligation or liability was incurred under the principal contract . . ."). In light of this and the consideration in the Letter Agreement, as well as GreenWhey's utilization of the loan proceeds to pay for contemplated services from Schwartz's company, the court rejects the failure of consideration as a defense to his obligation to guarantee payment of the failed Notes.

## II.    Failure of a Necessary Condition Precedent

Schwartz next asserts that his guarantee of the two Notes was conditioned upon his receipt of additional compensation discussed at various points between Land and Ludy, such as a seat on the board of directors of Holdings.  As this compensation was not necessary to provide the required consideration for the Guaranty Agreements, the failure to provide this additional compensation must operate as an *independent* reason to invalidate the Letter Agreement and Guaranty Agreements, since neither even mentions the possibility of this compensation.  This defense fails both because no agency relationship existed between plaintiffs and the parties upon whom Schwartz purports to have relied *and* because the parol evidence rule bars any evidence that such additional terms were even discussed, much less promised as a necessary condition precedent.  *See* discussion, *infra*.

### A. Agency

In particular, Schwartz argues that Baker Tilly, Land, GreenWhey, Holdings and its president Ludy acted for plaintiffs under an apparent agency theory.  To establish apparent agency under Wisconsin law, however, a proponent must demonstrate: "(1) [a]cts by the agent or principal justifying belief in the agency; (2) knowledge thereof of the party sought to be held; and (3) reliance thereon consistent with ordinary care and prudence." *Vandervest v. Kauffman Pizza, Inc.*, 60 Wis. 2d 230, 245, 208 N.W.2d 428 (1973). Moreover, actions taken by the alleged agent alone are insufficient.  Instead, "[t]he principal has to have acted affirmatively in establishing the apparent agency: 'the apparent authority for which the principal may be liable *must be traceable to him,* and cannot be established solely by the acts and conduct of the agent; the principal is only liable for *that*

16

*appearance of authority caused by himself.*'" *Amplicon, Inc. v. Marshfield Clinic*, 786 F. Supp. 1469, 1476 (W.D. Wis. 1992) (quoting *Sater v. Cities Service Oil Co.*, 235 Wis. 32, 40, 291 N.W. 355, 359 (1940)) (emphasis in original). Consequently, apparent agency is "dependent upon the principal's manifestation of consent." *See Vandervest*, 60 Wis. 2d at 245; *see also Amplicon*, 786 F. Supp. at 1477 (not finding apparent agency regardless of whether alleged agent of lessor made representation to lessee when there was "no allegation that [lessor] knew that he had made it.").

Here, Schwartz contends his belief that an agency relationship existed between plaintiffs and those others was justified by Land's statement in his June 18, 2012, email that CAP was Baker Tilly's "client" and CAP needed to extend loan proceeds within a certain amount of time. Schwartz also contends that his belief was justified by Land telling him that GreenWhey could be persuaded to give Schwartz a position on its board of directors, plus other incentives. Schwartz further contends that he was justified in believing Ludy was plaintiffs' agent because Ludy (1) was in contact with him about items plaintiffs needed from Schwartz and (2) was eventually the "go-between" for providing Schwartz's signature pages to plaintiffs.

The obvious problem with each of these pieces of evidence that Land or Ludy was an agent for plaintiffs under an apparent agency theory is that neither case involve the *principal* act to establish the relationship, much less justify defendant's belief in the agency. Indeed, plaintiffs' proffer no evidence of *any* statement or action by plaintiffs amounting to a "manifestation of consent" for Land or Ludy to act on their behalf. Not only did Schwartz not communicate directly with any of plaintiffs' employees, he was never

contacted by either plaintiff about the GreenWhey loans or Guaranty Agreements, and he saw no writing by either plaintiff indicating that Land or Ludy were their agent. There is also no evidence in the record that plaintiffs had any knowledge that Land, Ludy, Baker Tilly, GreenWhey or Holdings were offering Schwartz any additional compensation for guaranteeing the loans. Indeed, it is undisputed that Land described Schwartz as the owner of the vendor "who" would provide and install piping equipment funded by the loans when Land informed Patoka that Schwartz was willing to provide credit support for the loans. Nor did plaintiffs direct or authorize the offer of such terms by any party. Finally, there is no evidence that plaintiffs had any knowledge of the alleged agreement to hold Schwartz's signatures in trust.

While Schwartz may have perceived that Land and Ludy passed information between Schwartz and plaintiffs, this perception is not sufficient to establish an apparent agency relationship with plaintiffs. Nor is Land's mistaken one-time statement to Schwartz that CAP was a "client of Baker Tilly" enough, especially when Schwartz understood that Land was GreenWhey's "financial guy" from Baker Tilly and was actively helping GreenWhey to raise funds. While Schwartz argues that plaintiffs leaving the details of obtaining the guarantee to Ludy means it was reasonable for him to assume that Ludy represented plaintiffs, this makes no sense given that Ludy and GreenWhey were obviously negotiating at arm's length with plaintiffs to obtain a loan.

### B. Parol Evidence

Even if Schwartz's supposed apparent agency were somehow valid, the application of the parol evidence rule still independently bars Schwartz from introducing additional,

oral terms to the Letter Agreement as conditions precedent to enforcing the Guaranty Agreements. "The parol evidence rule is substantive law that bars evidence of any prior written or oral agreement from varying or contradicting the terms of the writing when the parties intend the written agreement to be the final expression of their agreements." *Town Bank v. City Real Estate Dev., LLC*, 2009 WI App 160, ¶ 11, 322 Wis. 2d 206, 217, 777 N.W.2d 98, 104, *aff'd*, 2010 WI 134, ¶ 11, 330 Wis. 2d 340, 793 N.W.2d 476 (citing *Federal Deposit Ins. Corp. v. First Mortgage Investors*, 76 Wis. 2d 151, 156, 250 N.W.2d 362 (1977)); *see also Stevens Const. Corp. v. Carolina Corp.*, 63 Wis. 2d 342, 354, 217 N.W.2d 291, 297 (1974) ("[P]arol evidence—the circumstances surrounding the execution of the contract and the practical construction of the parties—may not be introduced to vary the terms of a written contract.").

Here, the Guaranty Agreements state unambiguously that Schwartz "absolutely and unconditionally" guaranteed payment of the loans. (Pls.' Proposed Findings of Fact (dkt. #22) ¶ 35.) While this does not rise to the level of a merger clause, additional oral terms such as a seat on the board of Holdings and an agreement to hold Schwartz's signatures in trust would constitute parol evidence. Moreover, these alleged, additional terms cannot be part of the executed agreements because the Letter Agreement defines the consideration for the broader transaction: "[t]o induce [Schwartz] to provide the [Guaranty Agreements]," Holdings was to pay Schwartz 10% of all income received from GreenWhey and provide access to relevant books and records. (Pls.' Proposed Findings of Fact (dkt. #22) ¶¶ 155-156.) The Letter Agreement further precludes the incorporation of additional oral terms by stating that it is immediately binding and "may be amended only with the

advance, specific written consent of the [p]arties hereto." (Id. at ¶ 158.) When parties "include[] a 'merger' clause in their agreement, evidence of prior oral or written representations is generally not admissible . . . ." *Amplicon*, 786 F. Supp. at 1476 (citing *In re Spring Valley Meats, Inc.*, 94 Wis. 2d 600, 608, 288, N.W.2d 852, 855 (1980)) (rejecting parol evidence where the contract contained a merger clause).

Because the Letter Agreement does not contain any additional oral terms, now claimed to be conditions precedent, any evidence of those terms is barred by the parol evidence rule. Indeed, the August 2012 email referenced by Schwartz *predated* his execution of the Letter and Guaranty Agreements by approximately 30 days. If Schwartz actually believed that the Letter Agreement did not contain material terms to the transaction he envisioned, he should have raised the matter prior to executing it, or at least before signing the guarantees themselves. *See, e.g.*, *Raasch v. City of Milwaukee*, 2008 WI App 54, ¶¶ 10-11, 310 Wis. 2d 230, 341, 750 N.W.2d 492, 497 (refusing to set aside unambiguous contract where allegedly aggrieved parties thought they were getting a different deal than the contract provided). "Retrospective buyer's remorse is not a legitimate basis to relieve a party from the terms of a clear contract that he or she has signed." *Id*. at ¶ 11.

Recognizing the difficulty of his argument, Schwartz further argues that the fraud exception to the parol evidence rule should apply here. Under this exception, "a material misrepresentation of fact may render a contract void or voidable and the parol evidence rule does not exclude evidence to show such a misrepresentation as a ground for avoidance of the contract." *Grove Holding Corp. v. First Wis. Nat'l Bank of Sheboygan*, 12 F. Supp. 2d

885, 893 (E.D. Wis. 1998) (citing *Bank of Sun Prairie v. Esser*, 155 Wis. 2d 724, 731, 456 N.W.2d 585 (1990)). "In such a case the challenge really goes to the validity of the contract rather than the terms contained within it." *Grove Holding Corp.*, 12 F. Supp. 2d at 893. Schwartz predicates this claim on the fact that he did not receive the potential benefits discussed by Ludy in the August 16, 2012, email.

The elements of a fraudulent or intentional misrepresentation under Wisconsin law are (1) a representation of fact, (2) that was untrue, (3) which the person adversely affected must have believed and relied on to his or her detriment, (4) the representation was made knowing it was untrue or recklessly without caring whether it was true or not, and (5) the representation was made with the intent to deceive and induce an action. *Whipp v. Iverson*, 43 Wis. 2d 166, 169, 168 N.W. 2d 201, 203 (1969). Schwartz argues that a factual question exists as to whether Ludy made the representations discussed in the email in an intentional or reckless fashion in order to induce Schwartz to sign the Guaranty Agreements.

The problem with this argument is that the "misrepresentations" in question are merely promises of possible future performance, rather than misleading statements about existing facts. "Fraud cannot be predicated on unfulfilled promises or on representations about things to be done in the future." *Durkee v. Goodyear Tire & Rubber Co.*, 676 F. Supp. 189, 193 (W.D. Wis. 1987) (citing *Suskey v. Davidoff*, 2 Wis. 2d 503, 87 N.W.2d 306 (1958), *Fed. Deposit Ins. Co. v. Lauterbach*, 626 F.2d 1327 (7th Cir. 1980)). Critically, Schwartz does not and cannot contend that Ludy's August 2012 email made any false statements about GreenWhey's then-existing conditions. While Schwartz does claim that

"Ludy and others on behalf of Ludy made representations regarding the financial viability of the [GreenWhey] transaction that were false," Schwartz did not identify any promises *by plaintiffs* on which he relied in signing the Guaranty Agreements.[7]  Having chosen not to pursue any third-party claims against GreenWhey, its president Ludy, Baker Tilly or its director Lund, their conduct is not before this court.

## III.    Equitable Estoppel

Schwartz's final affirmative defense to enforcement of the Guaranty Agreements is equitable estoppel, which fails for similar reasons as his condition precedent defense.  "An estoppel is not created unless the party against whom it is urged had full knowledge of the facts, or unless the act of such party . . . induced the party claiming the estoppel to take action to his prejudice in reliance thereon."  *Caveney v. Caveney*, 234 Wis. 637, 291 N.W. 818, 824 (1940) (rejecting equitable estoppel defense in business valuation dispute where plaintiff did not know about defendant's unscrupulous bookkeeping and did nothing to induce defendant's conduct).

Here, again, defendant only offers evidence that *Ludy* attempted to induce him to sign the Guaranty Agreements.  Since there is no evidence that plaintiffs were aware that

---

[7] Even if Ludy's statements were considered fraudulent, there is again insufficient evidence to find that he was an agent of plaintiffs.  "The general rule of law is that fraud practiced by the [obligor] upon a surety, without any knowledge or participation on the part of the obligee by means of which fraud the surety is induced to sign the contract, does not affect the liability of the surety to the obligee."  *J.R. Watkins Co. v, Beyer*, 203 Wis. 397, 444 (1930) (principal obligor's alleged fraud inducing defendant to sign guaranty could not be attributed to plaintiff creditor for whose benefit guaranty was procured).   Plaintiffs did not have a legal representative involved in the supposed guaranty discussions, and they credibly maintain, without contradiction, that they never would have agreed to place any conditions on the effectiveness of the Guaranty Agreements. Consequently, even if an inference of fraud could give rise to a claim by Schwartz against Ludy, Schwartz's obligation to plaintiffs would remain unaffected.

Ludy made any un-kept promises, nor that Ludy was acting as their agent, plaintiffs cannot be equitably estopped from enforcing their agreement with defendant as written. Nor is there any evidence in this record that would support defendant's assertion that plaintiffs had an affirmative obligation to inform Schwartz that Ludy was not their agent, especially when there is no evidence that they were even unaware of any promises discussed by Ludy, plus Ludy was plainly working for a different entity at arms length from plaintiffs in this transaction -- namely, GreenWhey. *See Mortg. Assocs., Inc. v. Monona Shores, Inc.*, 47 Wis. 2d 171, 185, 177 N.W.2d 340, 349 (1970) ("To give rise to an estoppel by silence or inaction, there must be a right and an opportunity to speak and an obligation or duty to do so.").

Since each of Schwartz's affirmative defenses fail as a matter of law or have been waived, summary judgment in favor of plaintiffs is appropriate under each of the Guaranty Agreements in the full amount due and owing as set forth below. With interest having accumulated at a rate of $233.57 per day for 111 days since the amount of $1,170,827.40 was owed on August 18, 2017, an additional $25,926.27 is now due to plaintiffs in interest, allocated as follows: CAP is now owed $1,189,073.58 and Community Assets is now owed $521,500.22. In the absence of any guidance as to how to allocate the $138,270.13 spent on attorneys' fees and costs of collection between plaintiffs, that amount will be prorated between plaintiffs based on their respective awards. CAP will, therefore, be awarded an additional $96,097.74 and Community Assets will be awarded an additional $42,172.39.

ORDER

IT IS ORDERED that:

1) Defendant's motion for summary judgment (dkt. #13) is DENIED.

2) Plaintiffs' motion for summary judgment (dkt. #17) is GRANTED.

3) Defendant is directed to compensate plaintiffs as follows:

   a) judgment in favor of plaintiff CAP in the amount of $1,285,171.32; and

   b) judgment in favor of plaintiff Community Assets in the amount of $563,672.61.

4) Plaintiffs may have until December 22, 2017, to seek a supplement to the court's total fees and costs award for its collection efforts, including proof of all invoices billed and paid in this matter to date; if requested, defendant may then have until January 12, 2018, to oppose, including proof of all fees and costs defendant has incurred in defense of such collection efforts. The court will award the plaintiffs' their fees and costs under the Guaranty Agreements on a joint and several basis.

Entered this 7th day of December 2017.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge